Filed 6/29/23  Watcher v. Sanders CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN WATCHER et al., | |
| Plaintiffs and Appellants, | G061304 |
| v. | (Super. Ct. No. 30-2018-00991458) |
| JOSEPH L. SANDERS, as Trustee, etc., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from an order of the Superior Court of Orange County, Gregory H. Lewis, Judge.  Reversed and remanded with instructions.

Buchalter, Robert M. Dato and Jason E. Goldstein; Gordon Stuart for Plaintiffs and Appellants.

Cumming & Associates and William Cumming; Jeff Lewis Law, Jeffrey Lewis and Sean Rotstan for Defendants and Respondents.

## INTRODUCTION

Our Code of Civil Procedure[1], despite being a set of procedural rules, rests on a foundation of equity, and "its provisions and all proceedings under it are to be liberally construed, with a view *to effect its objects and to promote justice*." (§ 4, italics added.) The series of provisions in the code giving a trial court discretion to vacate defaults against defendants are so designed.[2] If a defendant finds he has been defaulted through mistake, surprise, inadvertence, or excusable neglect, he may seek to have that action vacated so he may answer. (§ 473, subd. (b).) But the equitable objective runs both ways; he must move for such relief within six months. (*Ibid.*) Said time limit "protects the finality of judgments . . . provides repose to litigants and . . . ensures that a motion for relief will be made promptly when memories are fresh[.]" (*Arambula v. Union Carbide Corp.* (2005) 128 Cal.App.4th 333, 345.)

The statute here at issue, section 473.5, attempts a similar balancing of equities by allowing relief for a defaulted defendant who, despite proper service of process, never received actual notice of the lawsuit in time to defend. (*Id.*, subd. (a).) "To get such relief, the defaulted defendant must submit an affidavit showing the lack of actual notice was not due to . . . avoidance of service or inexcusable neglect. (*Id.*, subd. (b).)" (*Luxury Asset Lending, LLC v. Philadelphia Television Network, Inc.* (2020) 56 Cal.App.5th 894, 908.) The defendant must in essence show the lack of actual notice was not a problem of his own making.

In this case, perhaps inadvertently, the defendant seems to have done the opposite. Taken at face value, his affidavits suggest he would have been lucky to receive actual notice of the lawsuit, at least by any normal means. His numerous residences and transient lifestyle made him difficult for anyone but a clairvoyant to pin down. But that is the more generous view. What he characterizes as his "lifestyle" fluidity of residence

---

[1] All further statutory references are to the Code of Civil Procedure.

[2] These provisions are sections 473, subdivision (b) through (d), 473.1, and 473.5.

2

could just as easily be avoidance of service. Because the trial court did not determine whether defendant was at fault for the lack of notice, we must reverse its order vacating his default and remand so a proper analysis may be undertaken.

## FACTS

Appellants John and Mabel Watcher are elderly plaintiffs who sued their former investment advisor and friend, Rick Floyd, and his company, American Bankers, LLC (American Bankers), for fraud.[3] Floyd had approached John Watcher in 2014 about investing the couple's savings in private mortgage loans. He claimed he would find potential borrowers, perform due diligence and arrange the loans, and then service them. The Watchers would sit back and receive the monthly payments. Instead, the Watchers claim, Floyd took the money and loaned it out under his or American Bankers' name, leaving the couple with no security interest or right to repayment. Floyd allegedly managed to bilk almost $1 million from the Watchers in this manner between 2014 and 2017.

Two of the loans born from the scheme alleged were from American Bankers to respondent Joseph L. Sanders, in his capacity as trustee for two trusts. One for $110,000 was secured by the property at 30269 Callaway Circle in Riverside, and the second for $283,000 was secured by Sanders' residence at 1 Half Moon Bay in Corona del Mar.

The Watchers received payments on both until February 2018, when the money suddenly stopped flowing and Floyd went incommunicado. At that point, over $100,000 of principal remained on the Callaway loan and all of the principal on the Half Moon Bay loan. Sanders was added as a defendant to the Watchers' first amended complaint, on grounds that he conspired with Floyd to defraud the Watchers on the two loans.

---

[3] Neither Floyd nor American Bankers is a party to this appeal.

*Service of Process and Sanders' Notice of the Lawsuit*

Naming Sanders turned out to be the easy part; finding and serving him was quite another matter. Before filing their first amended complaint in October 2018, the Watchers' counsel, Gordon Stuart, had sent Sanders at least three letters demanding repayment of the loans. Two of the letters were sent to the Half Moon Bay property, and the third was sent to Sanders' mailing address on Pacific Coast Highway in Huntington Beach (the PCH address). Sanders did not respond to any of them.

Over a nearly three-week span in February 2019, process servers tried almost a dozen times unsuccessfully to serve Sanders at one of his homes in Laguna Beach (the Baja property). So on February 13, 2019, Stuart mailed the first amended complaint, summons, and an acknowledgment of receipt form to the Baja property as well as the PCH address. His assistant also e-mailed the documents to Sanders' personal e-mail address. The cover letter for the mailing advised Sanders the Watchers would seek to serve him via publication if he did not respond.

In early March 2019, the Watchers were preparing to file a second amended complaint when they learned the Half Moon Bay property was in foreclosure due to Sanders' default on a senior loan. They filed an ex parte application to impose an equitable lien on the property for the remaining principal they were owed on their own loan. This application was granted, and the equitable lien was recorded on March 7, 2019. Notice of the ex parte application was e-mailed to Sanders, and notice of the court's order was mailed to Half Moon Bay, the PCH address, the Baja property, and a fourth address owned by Sanders in Long Beach. Sanders said nothing in response.

After filing the Watchers' second amended complaint, Stuart asked the Orange County Sheriff to try and serve Sanders at the Baja property. The sheriff was unsuccessful after five attempts. Stuart tried to find other addresses for Sanders using a LexisNexis person search, but no new addresses turned up except for the PCH address. As he did with the first amended complaint, Stuart mailed the summons, second amended

4

complaint, and acknowledgment of receipt form to Sanders at the Baja property. The package was not returned as undeliverable. Still, Sanders did not respond.

In September and October 2019, Stuart wrote to the United States Postal Service to request a forwarding address, if any, for Sanders, but did not receive a response. He also did internet searches for Sanders, but these searches did not yield any new information. With no other avenues to explore, Stuart applied to serve Sanders by publication, and this request was granted in November 2019. When Sanders failed to file a responsive pleading, his default was entered on February 14, 2020. Notice of entry of default was mailed to Sanders at the Baja property and Half Moon Bay property on February 28, 2020. The Watchers proved up the default and judgment was entered against Sanders on April 8, 2021.

But the Watchers were not the only people suing Floyd. Stuart was representing another plaintiff named Jeffrey Stoltz in a lawsuit against Floyd, and on September 19, 2020, Sanders was served with a subpoena duces tecum to give a third party postjudgment enforcement examination in the matter on October 2, 2020. According to the proof of service, he was personally served at the Baja property. He had an attorney friend, Cesar Vallarta, e-mail Stuart on the day the examination was to take place, to say Sanders was ill and would not be able to make it.

Then, in late February 2021, Stuart's firm mailed a settlement demand in this case to Sanders, in care of Vallarta, at the Half Moon Bay property. Copies were also mailed to Sanders at the PCH address and the Baja property. Vallarta did not discuss the letter with Sanders, and Sanders claims he did not receive a copy until much later.

*Sanders' Motion to Vacate Default*

In October 2021, Sanders, represented by new counsel, filed a motion to vacate the default entered in February 2020. The motion was made pursuant to sections 473.5 and 473, subdivision (b), as well as equitable grounds. In his supporting declaration, Sanders claimed he only learned about the Watchers' default judgment in

5

August 2021. He was in foreclosure on a property in Palm Springs, and was obtaining a loan to pay off the defaulted one. The lender pulled title and discovered the judgment.

In reaction to the judgment, Sanders filed for Chapter 11 bankruptcy on August 17, 2021. He then reviewed the court's file in this matter and discovered he had been served via publication and subsequently defaulted.

On March 14, 2022, the trial court granted Sanders' motion under the auspices of section 473.5. The court recognized that service by publication is unlikely to result in actual notice to the defendant, and the affidavits of due diligence filed by the Watchers had indicated no one was present at the Baja property or Half Moon Bay properties at the time the process servers approached. Additionally, the court observed the Watchers had not sent a notice of entry of default to the PCH address, which was Sanders' mailing address. It determined Sanders had not received notice of entry of default until August 2021, and therefore set aside the default and default judgment.

## DISCUSSION

On appeal, the Watchers question the trial court's refusal to consider certain evidence which they tried to present in sur-reply to Sanders' reply declaration. They feel the reply declaration was inconsistent with Sanders' bankruptcy-related testimony. We will get to that in a moment because it is an issue for remand. But we reverse not because of that, but because the trial court failed to apply the proper criteria in granting section 473.5 relief.

"We review a trial court's decision to grant or deny relief under section 473.5 for abuse of discretion."[4] (*Rios v. Singh* (2021) 65 Cal.App.5th 871, 885.) "Under this standard, '"a reviewing court should not disturb the exercise of a trial court's discretion unless it appears that there has been a miscarriage of justice." [Citation.]' (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 80.) Still,

[4] We reject the Watchers' contention that a de novo standard is required simply because the trial court refused to consider their evidence.

6

"""[a]ll exercises of discretion must be guided by applicable legal principles . . . . [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal."' (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 714-715.)" (*Kramer v. Traditional Escrow, Inc.* (2020) 56 Cal.App.5th 13, 27 (*Kramer*).)

## I.        Findings Required Under Section 473.5

As we have already noted, a defendant seeking this relief must show his lack of notice was not a problem of his own making. Additionally, though, the trial court's discretion to set aside the default under section 473.5 may only be exercised "[u]pon a *finding* by the court that the motion was made within the period permitted by subdivision (a) and that his or her lack of actual notice in time to defend the action was not caused by his or her avoidance of service or inexcusable neglect[.]" (*Id.*, subd. (c), italics added.) This means two findings are needed – one as to timeliness and the other as to lack of fault on the part of defendant. According to our record, these findings were either non-existent or incomplete.

Much of the court's ruling focuses on Sanders' averred lack of actual notice. Understandably, it was inclined to give Sanders latitude on this because it recognized he was unlikely to have received actual notice if service was by publication. But we find its analysis of Sanders' motion lacking in some key respects.

For one thing, the court found Sanders "received notice of the entry of default in August 2021" and his motion was therefore timely. Timeliness does not hinge on when the defendant *received* the notice of entry of default. Rather, a motion is timely if it is served and filed "within a reasonable time, but *in no event exceeding the earlier* of: (i) *two years after entry* of a default judgment against him or her; *or* (ii) *180 days after*

7

*service* on him or her of a written notice that the default or default judgment has been entered." (§ 473.5, subd. (a), italics added.) Undoubtedly, the motion was filed within two years of entry of the default judgment – it was entered on April 8, 2021 and the motion filed on October 27, 2021. And it was filed just under 180 days after service of the default judgment on April 30, 2021. But it was not filed within 180 days after *service* of the written notice of *entry of default* on February 28, 2020. Thus, the trial court only had discretion under section 473.5 to set aside the default judgment; *not* the entry of default.[5] It exceeded its authority under section 473.5 by vacating both.[6]

The trial court also failed to make any findings as to whether Sanders' own inexcusable neglect or avoidance of service was to blame. The subject was never even discussed in the ruling.[7] This concerns us not just because it is an element necessary for section 473.5 relief, but also because the factual scenario Sanders presented to the court could be viewed as dubious, so confidence in the court's ruling hinges on an indication he considered the issue.

In his moving declaration, Sanders says he did not receive the notice of entry of default in the mail at either the Baja or Half Moon Bay properties. He said the Baja property had been under construction and he was not regularly going there. But he gives no specifics around this assertion. How long was the construction going on? Why were process servers unable to serve him in February and September 2019 at the same address?

---

[5]     180 days after service of the notice of entry of default was earlier than 2 years after entry of default, thus, pursuant to the statute, the former deadline was the applicable one.

[6]     This could implicate another problem. It would be an idle act to vacate the default judgment without vacating the entry of default also, and yet this would be the only authority the trial court would have under section 473.5. If the default remained, the trial court would have no option but to enter judgment again upon the plaintiff's request. (See *Kramer*, *supra*, 56 Cal.App.5th at p. 39; see also *Howard Greer etc. Originals v. Capritti* (1950) 35 Cal.2d 886, 888–889.) On remand, the trial court will need to take this into consideration.

[7]     Sanders argues, despite the lack of a finding, that the trial court implicitly rejected the Watchers' assertions about trying repeatedly to contact him or serve him with papers. Even if this assertion were true, the court's own words suggest it assumed Sanders had to actually hold in his hand and look at a document in order for him to have any obligation to respond. It did *not* consider whether Sanders had needlessly created the conditions by which he would be unlikely to see the documents.

8

Once confronted with the Watchers' evidence regarding multiple attempts to notify him of the lawsuit and serve him with process via multiple means at multiple addresses, Sanders dissembled, coming up with excuse after excuse in his reply declaration.

He stated he never looked at his personal e-mail account because it was flooded with junk mail, and he corroborated this by submitting a screenshot of his inbox showing over 194,000 *unread* e-mails.[8] After receiving the Watchers' opposition to the motion, he said he searched and found the e-mail by which Stuart's assistant had sent the complaint to him on February 14, 2019. But Sanders' failure to review and cull his e-mail account is his own problem. He admits he received the e-mail; whether he chose to read it or not is irrelevant.

Sanders then goes on state that he had five different residences in the year 2019 alone! Those are the Baja property, the PCH address, the Half Moon Bay property, the Callaway Circle residence in Murrieta, and a property in Mexico. He would "regularly move[] around to each for extended periods of time." Though he acknowledges he receives mail at both the Baja property and Half Moon Bay property, he has been incredibly careless about attending to it. He says the Baja property's mailbox has not had a door for five years, making the mail visible and easy to steal. The mailbox at Half Moon Bay requires a key to open, and he claims he has not had a key since 2009, so he must reach a hand into the slot in order to retrieve mail. Apparently, he told the mailman to deliver mail into a slot by the garage, but is not sure whether all mail carriers abide by this request. And he admits he has received notices from the postal service advising him both properties' mailboxes are full and no mail will be delivered until they are emptied. He does not say when he received these notices, but he clearly felt no urgency around emptying the mail, supposedly because he felt he "rarely received any

---

[8] You read that number right.

9

important mail at either location." He concedes it is likely that long periods of time passed with mail not being delivered to either address.

We are at a loss to understand how Sanders could so much as go about the necessities of adult life in such a manner. Effectuating service of process or even getting Sanders' attention with his lifestyle and lax approach to his correspondence, such as it was, would have daunted Sisyphus.[9]

Also significant was Sanders' admission his personal mail was being delivered to the PCH address and had been since 2008.[10] If this was the case, he should have received notice *of the lawsuit*. In April 2018, he had a tenant at the PCH address who would "periodically" deliver to him large stacks of mail. The Watchers mailed a copy of the summons and first amended complaint to the PCH address on February 13, 2019. They had previously mailed a demand letter to the PCH address. And a copy of the notice regarding the equitable lien the Watchers had placed on the Half Moon Bay property was also mailed there.[11] If Sanders was receiving mail at the PCH address, he should have received these documents.

## II.        Potential Inconsistencies in Sanders' Testimony

On the whole, there is significant evidence to be weighed by the trial court on remand to make a finding on whether Sanders lacked actual notice due to his own non-relievable actions. And that brings us to the question of whether the Watchers' additional evidence should be considered. We think it should.

Once Sanders filed his reply declaration, the Watchers sought leave to file a sur-reply because they thought Sanders' averments were inconsistent with testimony he had given during the bankruptcy proceedings. For instance, Sanders' reply declaration

---

[9]        Though, as we noted earlier, Stuart's firm was finally able to serve him with the subpoena in the Stoltz matter at the Baja property in October 2020. Lightning strikes occasionally.

[10]        Remember, the trial court cited the Watchers' failure to send the notice of entry of default to the PCH address as one reason for granting Sanders' motion, because it may have indicated lack of actual notice.

[11]        Because the settlement demand letter was also sent to Sanders at multiple addresses, it is not credible for Sanders to blame his attorney, Vallarta, for failing to share it with him.

10

stated he was not living at the Baja property in 2019, and would only occasionally visit on weekends. But at a January 18, 2022 meeting of bankruptcy creditors, Sanders testified he lived at both the Baja and Half Moon Bay properties. At the same meeting, he testified he was mainly receiving his mail at the Half Moon Bay property, though in the reply declaration, he said it was all going to the PCH address. There are several other such examples of inconsistencies between the testimony offered by Sanders in the bankruptcy about his addresses and residences, and what he said in this matter. Such evidence should be explored and considered by the trial court on remand.

At oral argument on Sanders' motion, the trial court refused to allow the new evidence, stating: "Mr. Stuart, I don't consider evidence that's been presented on the day of argument, it's just not going to happen, it's new evidence and it's not proper." We cannot endorse this statement.

"The general rule of motion practice, which applies here, is that new evidence is not permitted with reply papers. This principle is most prominent in the context of summary judgment motions, which is not surprising, given that it is a common evidentiary motion. '[T]he inclusion of additional evidentiary matter with the reply should only be allowed in the exceptional case . . .' and if permitted, the other party should be given the opportunity to respond. (*Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8; see *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 252; *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316.) The same rule has been noted in other contexts as well. (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1308 [in preliminary injunction proceeding, 'the trial court had discretion whether to accept new evidence with the reply papers'].) [¶] This rule is based on the same solid logic applied in the appellate courts, specifically, that '[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453; see

11

*Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 720, fn.10.)" (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537-1538.)

The trial court's response indicates it was enforcing a blanket rule against allowing new evidence on the day of argument, which itself would be an abuse of its discretion. (See *In re Cortez* (1971) 6 Cal.3d 78, 85-86, quoting *People v. Surplice* (1962) 203 Cal.App.2d 784, 791 ["'The term (judicial discretion) implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. (Par.) To exercise the power of judicial discretion all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision.'"].)

But additionally, the Watchers were not the moving party on the subject motion. Sanders was. And it was Sanders who raised new evidence on reply. If the court was going to refuse to consider the Watchers' new evidence, it should also have refused to consider the new evidence in Sanders' reply declaration. If it chose to consider Sanders' new evidence, it should have allowed the Watchers to respond. On remand, all of this should be before the court.

## DISPOSITION

The order granting respondent's motion to vacate default and default judgment pursuant to section 473.5 is reversed and remanded so the trial court may conduct proceedings to make the findings required under section 473.5, and/or consider

12

any other grounds stated in respondent's motion.  Appellants to recover their costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


GOETHALS, J.


SANCHEZ, J.